May it please the Court, Andrew Hayes, Hayes Maloney for Mr. Marland. I'd like to reserve five minutes for rebuttal, if I may. I'd like to begin by taking responsibility for the way that things got turned around in the district court's analysis of this case. Would you mind pulling the microphone just a little closer to you? Sure. It's acoustics are hard in this room. Thank you. Yeah, sorry. The case got turned around in ways that, as I said, are probably my responsibility. But I want to begin, or I think we have to begin, which is with the lawyer's bedrock duty to be honest with the client. In representing the client, in renegotiating a fee agreement, in negotiating a business deal, in whatever dealings, you don't begin by saying, well, what are the narrow words of 3,300, what are the exact words of 3,400. Any analysis of whether you want to call it a fee agreement, a settlement agreement, a compromise, whatever, begins with the fact the lawyer has to make full disclosure to the client. The California State Bar, in an ethics opinion a couple of years ago, and in many previous opinions, has noted that when a lawyer is dealing with a client, whether it's a settlement, a potential claim malpractice, or some business venture, the lawyer has to make full disclosure to the client, including disclosure of potential claims of malpractice. Now, Thielen never did that here. Assuming what you say is true, and your client entered the agreement and received the benefits, what's the remedy? Your remedy is rescission, right? Rescission of the 2002 agreement. Yes. And so why doesn't your client have to tender back the $15 million he got in order for rescission to be effective? Because your argument seems to be if there's a violation, he gets to keep his money, and we get to litigate further against the law firm, right? Well, no, my main argument is he gets more money. Well, why doesn't he have to return that in order to avoid the mutual release agreement in the first instance? Well, my ---- This case says in rescission you don't have to return the money you received. Well, it's not rescission. If you void the 2002 agreement, you're left with whatever prior agreements the parties have. Now, in September 2001, just nine months before, they had this amended fee-sharing agreement. So you go back to that agreement. Now, if Thielen then wanted to say, well, wait a minute, we shouldn't have to pay you more money because you didn't do your share of the job, they could say that. They did say that in the case. They waited too long to assert as a counterclaim, but they said it at some point. They can litigate that. But that doesn't mean that we don't void the 2002 agreement. I mean, if we can at least get to that, then I'll, you know, feel like at least I've done my job, the first step of it. But you don't have to tender the money back, say, well, here's the $15 million because you owe me $25. But I'm going to give you the $15 back because you say I actually owe you that on a counterclaim? Well, if you accepted the benefits of the bargain, then there's a question of waiver. There's a question of whether or not to effectuate the remedy of rescission. You have to start at square one. They never cited a case saying money alone is subject to rescission and waiver. That's always, you know, I don't like this car. You know, here's the car back. You can't say give me back the money I paid you for the car and I'm going to keep the car. The waiver rescission cases are all about apples and oranges. They're not about cash. So I think that's the problem with that. I see them quite about cash. I mean, they're precisely about cash most of the time. That's when you rescind an agreement. That's what happens. You start over from square one. You're arguing that this agreement's void because of the non-disclosures. Yes. That's true. We can discuss. Well, in those cases, there's no prior agreement. I mean, here we had 1999 initial attorney-client agreement. We had the June 1999 agreements, which I have to say, they don't claim complied with 3300. They don't claim they complied with 3400, these June 1999 agreements. This is one that has a carve-out that says, you know, if you are granted immunity and you don't have to produce documents and you still refuse to testify, then you reduce your share. This is one they quote in their briefs as the, quote, penalty provisions that Marland walked himself into. You actually read that June 1999 agreement. It doesn't apply. He didn't walk himself into the penalty provisions, okay, and they never claim they complied with the ethical rules for that. But then you've got the September 2001 amendments. They amended the attorney-client agreement and they amended the fee-sharing agreement at the same time. This is also the agreement that gave Brunswick a direct 5 percent stake in the case, and yet the district court found as a matter of law that Brunswick was independent, which is also wrong. But you go back to the prior agreement. I mean, why would you go back? Why would the 2002 agreement is void? That doesn't mean the 1999 agreement is void. It doesn't mean the 2001 agreement is void. That's an argument they have to make. And if they have made it and the district court enters a judgment that says, well, okay, 2002 is void, 2001 is void, fine. But that's an argument they have to make. Let's get back to your – I think I understand your position on that. Okay. So why is it when Thielen told your client to get independent counsel, why didn't that excuse provide an excuse? They didn't tell him. What's in the document, right? No, no. They did not tell him you have to get independent counsel. They negotiated with Brunswick. They put a recital in the agreement. Yes, that's what I'm talking about. Okay. That Marland, who speaks rough conversational English the way you and I might order French in a restaurant, says he never read. They negotiated with Brunswick. So if Brunswick isn't independent and they send Brunswick boilerplate language saying you have to, you know, consult with independent counsel, that can't cut it. That's not actually telling the client, Marland, you have to consult with independent counsel. It's not, Your Honor. There's not a single case that says it is. You're negotiating with a conflicted party. And – Mr. Chaffetz. Sure. So you're saying that even though the agreement provided that Marland should go out and seek independent counsel because he didn't do it, therefore, Thielen is to be held to be at fault and to have not complied with Thielen's obligations? Is that your point? No, no, no, no, no. I'm just saying that merely putting in boilerplate in the contract saying doesn't mean that you've necessarily, as a matter of law, complied with the ethical rule. That's all I'm saying. All that the rule says is that the other side has been advised that they may seek with counsel. It doesn't say that they must seek counsel. Yes. With independent counsel. So what else are you saying Thielen should have done or was required to do? Well, that's what I want to – I'm sorry to repeat myself, but I want to make clear. If they comply with that requirement, but Thielen itself didn't make the self-incriminating disclosures, they can't enforce the agreement. Okay? They have to say, look, we, under 3400, under Honeycutt, which is California Supreme Court case, under BGJ Associates, doing any of these things, if we're settling a malpractice claim and exchanging 1542 releases in the California State Bar, at its bedrock statement, quote, before entering into a settlement agreement, which is what they now say it is, with a current client that includes a general release and a section 1542 waiver, an attorney must promptly disclose to the client the facts giving rise to any potential or actual malpractice claim. Okay? And my main argument here, the one thing I just got to make sure I get across here, is putting in the contract a statement that you have been told you can consult with independent counsel, okay, does not excuse their obligation to make their own disclosures. State Bar of California Standing Committee on Professional Responsibility and Conduct, formal opinion, it's an interim number, 06-0006. That's my point, Your Honor. So maybe they followed the letter of 3400. Of course. I mean, you can't argue that they didn't follow the letter of 3400. Your argument seems to be that we drained 3400 out of all its meaning on the disclosure. You're saying it doesn't matter what you say. Yes. Right? Yes. That's exactly right. I also say there's a fact issue regarding whether Brunswick and Chateau were independent. Yes. I understand that. Okay. Judge Bonita says another question. Okay. No, that's okay. Go ahead. So I hope I've answered your question, that the mere compliance with 3400 doesn't mean they win, particularly doesn't mean they win summary judgment. No, but it's a factor. It's not irrelevant, as you suggest. Oh, of course. Of course. It's a factor for trial. And you can't dismiss it as mere boilerplate. That's a fair go. I mean, you can't just because it's boilerplate doesn't mean it's not doesn't comply with the rule. I'm not, Your Honor, I don't think I've ever said it's irrelevant. What I've tried to say is if you put boilerplate in an agreement in a foreign language with a lawyer who is not independent, and then you know, let's look at the specific facts here. When challenged, their response is, well, wait a minute. He was represented by Brunswick. That's independent counsel. Okay. That's their argument. They had just months before negotiated an agreement with Brunswick which says, in its very words, Brunswick is hereby associated with Thielen. Okay. He's associated counsel with Thielen representing the Department of Insurance. So you think it's disingenuous for me to say it's just boilerplate. I think it's a tad disingenuous to say, oh, Brunswick's independent. Brunswick's just negotiated his own share of the deal in an agreement they signed. So these are all fact issues, Your Honor. You're under five minutes now. I want to make sure. Yeah. And, Judge Bidey, did you have further questions? Well, the only question I have is whether under the disclosure rule, under the professional responsibility code, whether the recitation that you may consult independent counsel is not Thielen's responsibility to certify that the counsel that they've negotiated with is independent counsel. I mean, that seems to me that that's Marlan's problem. He's an attorney. He's got sophisticated attorneys. He's got a lot of money at stake here. They've had a course of dealing over a number of years. If he's not satisfied with the counsel and the representation, if he doesn't think that his English skills are sufficient, he can go out and get an independent translation of this document. He can get other counsel. What else was Thielen supposed to do with respect to the question of making sure that Marlan is informed of his ability to get another – to get an independent judgment from an attorney? They have – well, what they had to do – They had to – they had to – Yes, this is a response. You had to go out and find a lawyer or get appointed counsel or something? I mean, it just – No, and here's what they had to do. I'll answer you very specifically. They had to say, look, Mr. Marlan, Mr. Brunswick has not fathomed for the last three years that we, Thielen, have a structural conflict. Mr. Brunswick has been obsessed with making sure that the sharing ratios between the Keetam case and the DOI's case were the same, that the 50-50 is at 42-75 in both cases. And, Mr. Marlan, you need to know that Mr. Brunswick doesn't grasp, because we haven't told Mr. Brunswick, that if a dollar goes to the Keetam case, you get more of it than if it comes from the DOI recovery, even if the profit-sharing ratios are the same. They have to tell Marlan that, and then Marlan can say, aha, gee, maybe I do need to go talk to another lawyer. My point is – I mean, your view is – I mean, put it in simplistic terms, that in order to comply with the ethical rule, when someone is represented by new counsel, you have to say that your new counsel isn't doing his job. No, no, no, no, no, no, no. It's Thielen that didn't make the disclosure. No, but you're saying that Brunswick didn't get it, right? Yes. Thielen should have told me. Thielen knew Brunswick didn't get it, presumably, because they called out – So they had an obligation to go to Marlan and tell him that Brunswick wasn't getting it? No, they just had – their first obligation was to tell Marlan they had a conflict. They didn't do that. But when you're listing of things that they should have told, why didn't they answer Judge Bybee's question, you seem to imply that. He said it perfectly. Well, if I say, you may want to consult a lawyer, but all is well and good, and you don't consult the lawyer, that's kind of different from saying, you know, I really screwed up here, and you may want to consult a lawyer. It's very different. And whether – even if the verbiage complies, if it complies to a T, they still don't win, because they didn't make the disclosure. End of story, period. They had to just say – they had to say, look, we've got a fundamental conflict here. Okay? The Attorney General pointed it out to us. We told you it was B.S., but actually, we've acknowledged internally that it's true. I mean, we have this memo from June 2004 from one Thielen partner to three others that says we have a major conflict of interest. If we ever take the position that we're representing Rono and the Commissioner at the same time, a major ethical violation that the Attorney General – we'd be giving the Attorney General a stick to beat us with, and we would deserve every blow. That's what they said in 2004. And they said if they ever took the position they represented both at the same time, they'd be back in the same miserable soup they were in in 2002. And my argument is that whatever the verbiage is in the contract, you don't have to make any findings about whether that's insufficient or anything. All you have to find is that they had a duty to disclose their actual or potential malpractice in Marlans' claims against them, and that they never – they never claim they did that. They don't say they did it. You're down to 20 seconds. So you want to reserve the rest? Five and 20 seconds on my rebuttal. No, it's 20 seconds total. Oh, I'm – sorry. Yeah. Okay. But we'll give you a little bit of time for rebuttal. Ms. Thurm. May it please the Court, Wendy Thurm for Thiel and LLP. Based on the briefs submitted to this Court, the key question raised on the appeal is whether or not the district court's order was correct in finding that 2002 agreement was a renegotiated fee agreement and a settlement agreement, that therefore, 3-300 doesn't apply. I can't tell from Mr. Hayes' argument whether he's – where he is on that argument, but in our view, the district court was correct that 3-300 does not apply. No California case has ever held that 3-300 applies to either a renegotiated fee agreement or to a settlement agreement. And 3-400 is the specific rule of professional conduct that applies to a settlement agreement between a lawyer and a client. Now, there are several other ways this Court may affirm the district court's opinion, and Judge Thomas, you started to allude to it with the questions regarding rescission. Let me flip it around and talk about ratification. Mr. Marlan doesn't have a claim for rescission. He – the way the case came to the district court was in a declaratory relief claim by Thielen to enforce the agreement, and several affirmative defenses and counterclaims to that effort. But there was no rescission claim made, and in fact, there's no affirmative defense of rescission made by Mr. Marlan. However, on summary judgment on a question that was not reached by Judge Walker, but on which this Court can affirm based on the undisputed facts established in the district court's order, Mr. Marlan accepted the benefits of the agreement at a time when he had information suggesting he may have a right to or at least a claim to void the agreement. He had received legal advice, including a legal memorandum from outside counsel, not Mr. Brunswick and not Mr. Chateau, about the potential ways in which he could void the agreement. And he accepted the benefits twice. Twice there were payments made by Thielen to Mr. Marlan subject to the 2002 agreement, and he accepted the benefits. That is classic ratification under the California Civil Code and under the recent case of Fergus v. Songer. So under the record in the district court and on the record in this Court, you can easily affirm on that basis. Now, I want to say something about standard of review. We cited the Brown v. City of Los Angeles case in our brief, and we're well familiar with the de novo review standard for summary judgment. Mr. Marlan did not challenge many of the facts that were found to be undisputed in the district court's order. And when that happens, what Brown says is you take the record in the court of appeal subject to those undisputed facts found by the district court. It's only – there are no arguments in Mr. Marlan's brief where he says the district court erred because he should have found a genuine issue of material fact in dispute with respect to whether 3300 applies. No such argument was made. And so there are a variety of factual findings essentially made by the district court that certain facts were not in dispute. And on that basis, this Court can affirm on it's a renegotiated fee agreement and it's a settlement agreement and 3300 simply doesn't apply. No California case has ever held that it does. The Court can also affirm by finding that – by relying on the Court's findings that the following facts were undisputed. Number one, that the agreement was not the subject of undue influence. Court made that finding, that there was sufficient consideration, that the agreement was negotiated at arm's length over many, many months, that Mr. Marlan himself was a sophisticated lawyer, that Thielen released the potential claim that it had that Marlan had in fact breached the prior agreements by destroying the contract and that Marlan accepted the benefits under the agreement. Now, with respect to the disclosure argument, let me say first, this was not an argument that was made in opening brief by Mr. Marlan. It was an argument that was only made as sort of a throwaway line in reply. So our first position is it's waived. But second of all, and the district court touched on this, which is Mr. Marlan's position here is that Thielen should have gone back into its file, thought of every possible claim that Mr. Marlan may have had against him based on the course of conduct, and disclosed that. There's no California case interpreting 3400 or any other provision of an attorney-client relationship or a fiduciary duty that requires a lawyer to come up with a long list of claims that a client might potentially make against it and disclose that. There's simply no precedent for that sort of disclosure. Now, with respect to what was exchanged between the parties, the district court found the facts were undisputed that the parties exchanged quite a bit of charges and countercharges. Mr. Marlan claimed that Thielen was acting in bad faith, claimed that Thielen was making an issue about the contract deportage when they didn't have a right to do that. Thielen was claiming that Mr. Marlan had breached the agreements and was not negotiating good faith. These went back and forth for months, for six months, in fact. And after that period of time, the agreement was entered into. In fact, the – there is evidence in the record in the district court and in this court that Mr. Carville for Thielen and Mr. Brunswick specifically discussed the waiver, specifically discussed the release, discussed 1542, and what it would mean. So there was ample negotiation, ample time for consideration of those issues. I want to pick up on something that you said, Judge Bybee. I agree entirely, and this is a point we made in our brief, which is it's not the lawyer governed by 3400. It's not her burden or his burden to ensure that the second set of lawyers is, in fact, independent. In fact, should the lawyer take it upon himself to inject himself into the question as to whether the second lawyer is independent, that, I think, would call into question the independence of the second lawyer, and it would call into question whether or not the lawyer was, in fact, giving advice to the client in the circumstance where the rule contemplates that the second lawyer is going to be giving the advice. So having Thielen inject itself into that relationship as to who is going to be giving that independent advice, I think, would undercut the rule entirely. Also, with respect to Judge Thomas, you mentioned the language that was in the agreement advising Marland to get independent counsel. Again, Judge Walker found it was undisputed. It wasn't just in the final draft. Every draft of the 2002 agreement in two different places said Marland here is representing that he is represented by independent counsel and that he is not relying on Thielen for purposes of deciding whether to enter into that agreement. That language or a similar language was in the first draft that was sent in June of 2002 and was in the final draft and every draft in between. And Judge Walker held that it was undisputed that that was noticed as required by 3400. That fact would be that finding by Judge Walker was not challenged on appeal. Now, let me also say, Mr. Marland hasn't raised any question as to the fairness and reasonableness of the agreement. He did in the court below, Judge Walker didn't reach that issue, felt he didn't have to reach that issue, but if this Court concludes that 3300 does apply, then the record before Judge Walker, in our view, again, on the undisputed facts that he held and that were not challenged on appeal, that the agreement is objectively fair and reasonable. Or the alternative, I suppose if we reach the 300 issue, we'd have to send it back to Judge Walker for reassessment in the first instance, right? I don't agree with that, Your Honor. Again, given the standard of review from Brown v. City of Los Angeles, there are I can give you a series of findings by the district court or holdings by the district court of facts that were undisputed and that were not challenged on appeal. And under Brown's ---- That is true, but a finding of reasonableness isn't exactly an undisputed fact. That's a finding of law, really, isn't it? Correct, Your Honor. What I was going to do was point you to those portions of the district court's opinion where he held certain facts undisputed, and let me give you those. And then our argument is, as a matter of law, the agreement is objectively fair and reasonable based on those sets of undisputed facts. That is, the agreement was not the product of undue influence, supported by adequate consideration, negotiated over many months by sophisticated parties, that Marland himself was sophisticated, that ---- and this is important, that Thielen had a good-faith basis for believing that Marland had breached the prior agreements by destroying the portage during the pendency of the executive life litigation, that Thielen had agreed to waive that claim, and that despite all of this, that Marland still ended up with $19 million. Now, there's one other important aspect of this that I heard a little bit about from Marland's counsel, and that goes to this June 1999 side letter. In his brief, Mr. Marland's counsel asserted that the district court erred by not finding that side letter agreement invalid. This Court can search in vain for any claim in the district court that the June 1999 side letter was invalid. It's not in the counterclaims. It's not in Marland's motion for summary judgment. So the district court couldn't have erred in not finding an agreement invalid that wasn't challenged on any basis in the district court. The district court cited to the June 1999 agreement, and at least with respect to its consideration ruling, in our view, took that into account. So I think from the initial questions you were asking counsel, Judge Thomas, why didn't you give the money back? And I think the answer you heard was, well, he was owed more. Well. I mean, I was leading to the ratification, but the theory, but I just. Well, it's important because there's not, it's not a status quo ante if the 2002 agreement isn't, isn't enforceable. There were claims and counterclaims being made at the time that that agreement was entered into as to whether or not Marland had breached and would be owed anything, or whether he had, in fact, triggered one of the provisions of the side letter agreement. So if, in fact, as Judge Walker found Thielen had a good faith basis for believing Marland had breached, and if that had been the case, he might have been very reasonably could have ended up with anywhere between zero and what would have come from the side letter agreement, which was 26.5 percent. He ended up with 35 percent. So when you take all the other findings made by the district court as to which facts were disputed and which facts were not disputed, together with how Mr. Marland challenged it on appeal, we think this Court can find that it's objectively fair and reasonable. Now, I'm interested to know whether the Court has any questions about our statute of limitations argument, which was a. Yes, independent reason for. Independent reason for affirming. So 3400 of the California Code of Civil Procedure governs claims other than claims for actual fraud between that arise out of the attorney-client relationship. And in our view, and we made this in our separate motion for partial summary judgment, the first claim for breach of fiduciary duty and the fifth claim by Marland for negligence squarely fall within the ambit of 340.6. And even though the district court didn't reach that question, again, both with respect to ratification and with respect to statute of limitations, there were certain facts that the district court found were undisputed that would allow this Court to affirm. Number one, that Mr. Marland had met with other counsel, not Brunswick and not Chateau, in 2003 and 2004, that this counsel had written a memorandum that had suggested claims that Marland might have against Thielen, that that memorandum was shared among those lawyers, that Mr. Marland so he was on notice, that's the first prong of 340.6, and that he had actual injury by, to the extent he received less than what he thought he was owed, certainly with more than a year, and also that there was no continuous representation that stopped more than a year before the date that Mr. Marland asserted his arbitration claim in New York. So at a minimum, we think the breach of fiduciary duty claim and the negligence claim, the summary judgment can be affirmed on that alternative ground. Unless the Court has any other questions. Roberts. Thank you, counsel. Thank you. Just very quickly, Your Honors, if I may, I want to begin with the court. Hold on for a second. Let's put two minutes on the clock. We'll give you a minute. Thank you. That's very kind. Come back from New York where I'm not going to be. First, the money, no money was paid at all until mid-2004. This is Thielen's own brief, says that the money was paid after May 2004. That's less than a year before Marland filed the lawsuit. So no actual injury more than a year before Marland filed the lawsuit. That's the end of that argument, in my respectful opinion of the Court. As for whether, you know, we didn't make this argument, one thing's got to be crystal clear, they've never claimed they made those self-critical disclosures. They say, I'm making it up. No court has ever said that. I invite the Court, then, to decide the case on the following issue. BGJ Associates and Honeycutt. California Supreme Court, California Appellate Court and BGJ, and BGJ courted Beeney v. State Bar, which is yet another California Supreme Court case. As Thurm says, I didn't make that argument. I apologize for the typos in my brief, but we've got the last page of my point one in my opening brief, the entire point two. This is our main argument, gentlemen. I somehow, it got buried down below with a lot of back and forth about fraud and a lot of stuff where we all got turned around. But this is the point. If California law required them to make all the disclosures to their client that they would make to their client against a third party, and I'm just, that's quoting what BGJ Associates says. If the law required them to do that, they don't even claim they did it. They never claim they did it. Judge Walker never found that they did it. Therefore, for that reason alone, they cannot enforce the 2002 agreement. And it doesn't matter whether they otherwise complied with 3300 or 3400. Very quick word about 3300, though, 3300 has this carve out for initial attorney-client agreements and for renegotiated agreements, except where the attorney acquires an interest, property interest, adverse to the client. And that carve out has been defined in Hawk versus State Bar, 45 Cal 3rd, 589, as the ability to summarily extinguish the client's interest in the property. Now, the deal here was Marland agreed to let Thielen represent the DOI. That's a separate case, separate deal. And the renegotiation involved that property interest, which Thielen, as they said in 2002 and threatened him and said, look, we'll just walk away. We'll just quit the commissioner's case and forfeit our fee. Well, that's a threat to summarily extinguish the property interest that Marland had, which was a share of that DOI fee. So you don't have to find 3300 applies generally to contingent fee cases. But it applies here because it was a deal between Marland and Thielen to let Thielen represent the DOI, another client in another case. And so the carve out to 3300 applies as well. I thank the Court for indulging me on time. If you have any further questions, thank you very much. Thank you. Thank you both for your arguments. The case is currently submitted.
judges: Thomas, Bybee, Benitez